———

Ex parte GYTL et al.

(District Court, D. North Dakota, S. E. D.   January 20, 1914.)

1. ALIENS (§ 53*) — DEPORTATION — COUNTRY TO WHICH ALIEN MAY BE DEPORTED.

Immigration Act Feb. 20, 1907, c. 1134, § 35, 34 Stat. 908 (U. S. Comp. St. Supp. 1911, p. 518), which provides that the deportation of aliens found to be unlawfully within the United States "shall be to the trans-Atlantic or trans-Pacific ports from which said aliens embarked for the United States, or if such embarkation was for foreign contiguous territory to the foreign port at which said aliens embarked for such territory," construed in connection with sections 20 and 21, which require the deportation of an alien to be to the "country whence he came," as to the last provision applies only to aliens who embarked for contiguous territory with intent to enter the United States therefrom, and not to such as enter a contiguous country with the intention of remaining there and who become domiciled there, although they may afterward enter the United States.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. § 53.*]

2. ALIENS (§ 53*)—DEPORTATION—COUNTRY TO WHICH ALIEN MAY BE DEPORTED.

Petitioners emigrated from Austria to Canada, having tickets for Winnipeg, where each had relatives or friends. They were admitted by the Canadian authorities and remained and worked in Manitoba for periods

of from 6 to 18 months, when they were employed as members of a threshing crew by a farmer living in North Dakota, near the Canada line, who took them to his place, where they worked until arrested, and after hearing were ordered deported. They did not know that they had gone outside of Canada and did not intend to do so, nor did either they or their employer know that their crossing the line was in violation of law. *Held* that, while they were subject to deportation, the Department had no authority to order them deported to the ports from which they embarked for Canada, but, since that country had received them and they had become domiciled there, they should be returned to Canada as the country whence they came.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. § 53.*]

3. HABEAS CORPUS (§ 109*)—RELIEF—DISPOSITION OF PERSON.
    Under Rev. St. § 761 (U. S. Comp. St. 1901, p. 594), which authorizes the court in habeas corpus proceedings "to dispose of the party as law and justice require," it is not confined to simply remanding or discharging a prisoner, and in case of an alien held for deportation may order his deportation to a country other than that required by the order of the Department, where such order was unauthorized by law.

[Ed. Note.—For other cases, see Habeas Corpus, Cent. Dig. §§ 97, 98; Dec. Dig. § 109.*]

4. ALIENS (§ 53*)—DISABILITIES—"COUNTRY WHENCE HE CAME."
    The phrase the "country whence he came," as used in Immigration Act Feb. 20, 1907, c. 1134, §§ 20, 21, 34 Stat. 904, 905 (U. S. Comp. St. Supp. 1911, p. 511), authorizing deportation of an alien to the country whence he came, means the country in which the alien last had his domicile prior to his unlawful entry.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112; Dec. Dig. § 53.*
    For other definitions, see Words and Phrases, vol. 2, p. 1653.]

Petition by Pyt Gytl, Tonyj Senkiw, Aleska Plyta, Wasyl Tabazcka, and Piotr Czulinski for writ of habeas corpus. Order for detention modified.

Seth Richardson, of Fargo, N. D., and C. J. Murphy, of Grand Forks, N. D., for petitioners.

Edward Engerud, U. S. Dist. Atty., of Fargo, N. D., for respondents.

AMIDON, District Judge. This is a proceeding by habeas corpus to inquire into the cause of imprisonment of the above-named persons by a commissioner of immigration and the sheriff of Grand Forks county, N. D., acting under authority of such commissioner. All of the defendants are Austrians. Two of them arrived by steamer at Quebec, in the Dominion of Canada, in the month of April, 1912. Three of them arrived at the port of Halifax in May, 1913. They vary from 19 to 34 years in age and are in sound health. They were all examined by Canadian inspectors of immigration at the port of entry and passed. They all had through tickets to Winnipeg, and proceeded at once to that city, where they had acquaintances, and some of them relatives. They have since worked as common laborers upon railroads and farms in the province of Manitoba. In the month of September, 1913, they were at work as harvest hands near the village

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of Gretna, which is located on the Canadian side of the international boundary. Having completed their job, they went to Gretna, for the purpose of taking the train back to Winnipeg. While they were spending the evening in a hotel there, one Napoleon Longtin solicited them to work for him as members of a threshing crew. They accepted the employment, and four of them were taken in an automobile and one in a carriage to Longtin's farm. The journey was made when it was very dark, late at night. The farm is situated on the American side of the line, about three miles from the boundary. The petitioners did not know that they were being taken into the United States, and would not have gone there if they had known. Neither did they know that it was illegal for them to enter the United States. Longtin himself knew nothing of our Alien Labor Law, and was quite unaware that he was violating its provisions.

The men worked for him as members of his threshing crew until October 2d, when they were arrested by an immigration inspector. They were all examined by him under oath, and their testimony taken in shorthand, and it is now before me as part of the return to the writ. They had no counsel, but gave their evidence with transparent candor. As part of his report, the inspector used the following language as to each alien:

"Attention is especially called to. the fact that this alien claims that he was virtually kidnapped and taken into the United States against his will. Considering his attitude and willingness to answer all questions put to him, I believe he is telling the truth."

The inspector further found, however, that these aliens were in the United States in violation of law: (1) Because they entered under a contract to perform manual labor; (2) because they entered by wagon road instead of a port, and without inspection; (3) because they were persons likely to become a public charge.

The aliens all testified, however, that they were in perfect health, and had been since their arrival in Canada, and there was no evidence whatever to support the last finding. Each man had $45 on his person at the time of the arrest. The inspector reported the evidence and his findings to the Secretary of Commerce and Labor, who thereupon issued his warrants directing that petitioners be deported to the country whence they came.

In the meantime Longtin had been arrested for violating the Alien Labor Law, and bound over to the grand jury, and the deportation of the aliens was suspended in order that they might be used as witnesses upon his trial. At the next term of court Longtin was indicted, and was arraigned for plea in the month of December, 1913. Upon his examination, it appeared that he was a man of substance and character in the community where he had lived for many years; that he owned a half section of land upon which he resided with his wife and children; that he had never been arrested before, or charged with any crime. He made a frank statement of what he had done, and informed the court that he was not aware that he was violating any law, but was simply trying to get laborers to thresh his grain. Counsel for the government confirmed his statements as the result of their investiga-

tion. A plea of guilty was then entered. The court, considering the offense to be without any wrongful intent, imposed a fine of $5 as a sufficient vindication of an innocent violation of the law. A short time thereafter a civil suit was brought against Mr. Longtin by the government, in which it is sought to recover a penalty of $5,000 and costs because of his bringing these aliens into the United States. This is the minimum penalty fixed by the statute. That case is still pending.

The aliens have been detained in jail. After the case against Longtin had been disposed of, they supposed that they would be permitted to return to Canada. It was then that they learned for the first time that the government contemplated deporting them to Austria. Thereupon their counsel sued out a writ of habeas corpus, to test the right of the Commissioner of Labor to deport them to that country. The facts above recited as to Mr. Longtin are a part of the records of the court. The petition and return disclose the facts as to the petitioners, and it is conceded by the government that the Secretary of Labor at the time he issued his warrants had before him no evidence except that which is now before the court.

It is clear from the evidence that petitioners are illegally in the United States. It is equally clear that their entry was the result of an innocent mistake on their part, and on the part of Mr. Longtin. It is the right and duty of the Department of Labor to deport them, but this power ought to be exercised by a just government with scrupulous regard to the rights of petitioners. They do not cease to be human beings simply because they are aliens, nor are they wholly outside of the protection of the Constitution. The evidence presenting no controverted issue of fact, the determination of the country to which they should be deported is wholly a matter of law, and the decision of that question by administrative officers is not binding upon the court.

[1] The question involved turns upon sections 20, 21, and 35 of the Immigration Act of February 20, 1907. The two first sections require that any alien who enters the United States in violation of law shall be deported to the country "whence he came." Section 35 reads as follows:.

"That the deportation of aliens arrested within the United States after entry, and found to be illegally therein, provided for in this act, shall be to the trans-Atlantic or trans-Pacific ports from which said aliens embarked for the United States, or if such embarkation was for foreign contiguous territory, to the foreign port at which such aliens embarked for such territory."

These three sections are to be read together, and a meaning arrived at, if possible, which will give effect to all their provisions. In the great majority of cases the alien comes direct from the country of his nativity, and in case of deportation should be returned there. The Department, as the cases on the subject show, has been zealous to make this a universal rule. That would simplify matters. But, like most universal rules, it will work cruel hardship in individual cases. The general rule under the statute clearly is that the alien shall be deported to the country whence he came. This, of course, is not necessarily the country of his nativity or citizenship. Section 35 gives a specific definition of the words "whence he came" in certain cases. The first

clause of that section deals with aliens who embark directly for some port of the United States. They are to be deported to the place from which they embark. The second clause deals with aliens who embark for the United States, but land at some foreign contiguous territory. In my judgment the last clause, like the first, is confined to aliens who embark "for the United States." It was a well-known evil at the time the statute was passed that aliens seeking to enter the United States in violation of its laws frequently landed either in Mexico or Canada, and passed into the United States across the long and unguarded international boundary lines. The last clause was intended to meet that evil. If Mexico or Canada was simply used as a front porch for entering the United States, then the alien was to be dealt with the same as if the entry had been made at one of our own ports. The statute, however, clearly requires that, in order to come within its provisions, the alien must have embarked "for the United States." The words "such embarkation" import into the second clause the embarkation referred to in the first clause, and that is an embarkation "for the United States." By this I do not mean that, in order to come within the provisions of section 35, the alien must have had a through ticket to some point in the United States at the time he embarked from the trans-Atlantic or trans-Pacific port. All that is required in order to bring him within the statute is that he should have formed the intent or purpose of entering the United States as the final object of his embarkation. Ex parte Wong Yon (D. C.).176 Fed. 933, 940, 941. This is not inconsistent with his stopping in Canada, and presently renewing his journey for the United States. It is wholly a question of intent to be gathered from all the facts and circumstances. When these are subject to different inferences, the finding of the Labor Department would be conclusive upon the courts. An alien whose ultimate object was to enter the United States might tarry for some considerable time in Canada for the purpose of eluding or deceiving the immigration officers. In any such case his entry into the United States pursuant to a previous intent so to do would justify and require his deportation to the trans-Pacific or trans-Atlantic port at which he embarked. This interpretation will, in my judgment, fully meet the evil which the last clause of section 35 was intended to provide against.

[2] The present case does not fall within the above rule. The evidence leaves no room for doubt that these aliens never intended to enter the United States. They came to Northwestern Canada with the intent of making it their home. Their tickets read to Winnipeg; they were examined at the port of entry by the Canadian inspectors of immigration, and passed, and received into the population of that country. Having been thus received by the proper Canadian authorities, the United States is certainly doing its northern neighbor no wrong by returning them there. These aliens have kindred and friends in Manitoba; part of them have resided there for a year and six months, and others for six months. By their conduct they have shown clearly that their intent was to make that country their domicile. The evidence shows, and the inspector has found, that their entry into the

United States was an innocent mistake. Surely, under this state of facts, neither justice nor law requires their deportation to Austria. To do that would impose upon them a punishment such as civilized countries have heretofore inflicted only for the gravest offenses. Fong Yue Ting v. United States, 149 U. S. 698, 739, 740, 13 Sup. Ct. 1016, 37 L. Ed. 905. It would also be a wrong to Canada. She has welcomed these men into her population. They have entered the United States without any wrongful purpose. In turning them back we ought to return them to the country whence they came, that is, the country where they had their domicile, and into which they were welcomed after a full compliance with law. It was insisted at the hearing that to return them there would be a violation of understandings between the two nations, and agreements made between their Labor Departments. I have carefully scrutinized all that has been presented in support of their claim, and find nothing which sustains it. The Canadian immigration law is much less stringent than ours. It excludes paupers and persons diseased in mind or body or who have been convicted of crime involving moral turpitude. The petitioners come within none of these classes, and, so far as I can discover, there is nothing in any Canadian statute, regulation, or in any agreement between that country and the United States, which requires their deportation to Austria. Having made Canada their home, that is the country whence they came into the United States. Their domicile there exempts them from the provisions of section 35 of our statute, because their entry into the United States was no part of their purpose when they embarked at the trans-Atlantic port.

[4] In my judgment, the phrase "the country whence he came," as used in the Immigration Act, when sections 20, 21, and 35 are considered together, means the country in which the alien last had his domicile prior to his unlawful entry into the United States. This is the rule fairly deducible from the decisions on the subject. Lui Lum v. U. S., 166 Fed. 106, 92 C. C. A. 90; United States v. Redfern (C. C.) 186 Fed. 603. Same case under title of United States v. Ruiz, 203 Fed. 441, 121 C. C. A. 551; United States v. Sisson, 206 Fed. 450, 124 C. C. A. 356; In re Mah Wong Gee (D. C.) 47 Fed. 433.

There are some general observations in the last paragraph of the opinion in Frick v. Lewis, 195 Fed. 693, 701, 115 C. C. A. 493, which indicate a different interpretation of the statute. These observations, however, were not necessary to the decision, and, when the facts of that case are examined, nothing is found which conflicts with the interpretation above indicated. In that case the petitioner, a Russian, entered the United States at the port of New York in 1904. After residing in the state of Michigan for six years, but without becoming an American citizen, he crossed the river to the Canadian city of Windsor for the purpose of introducing a woman into the United States for immoral purposes. He was in Canada only an hour, and, so far as the decision shows, that was the only time he was ever in that country. It was held that he was subject to deportation to Russia. Clearly he ought not to have been deported to Canada, because that country had never received him into its population, neither did he embark for

it when he came from the latter country. He left Russia with the intent of residing in the United States and had resided there for six years. If he was to be deported by the United States, clearly Russia was the country to which he should be sent. If Canada has never received an alien, and his presence there was only the temporary sojourn of a traveler, it is manifest that Canada would not be the country "whence the alien came" within the meaning of the immigration law. Such an interpretation sticks in the mere words of the statute, and disregards its purpose.

[3] What ought the court to do in the present case? The Commissioner of Immigration has a legal right to detain the petitioners; but he has no legal right to detain them for the purpose of deporting them to Austria. The warrant issued by the Acting Secretary of Labor simply commands the commissioner of immigration "to return the said alien to the country whence he came." The warrant is probably void for indefiniteness. Ex parte Yabucanin (D. C.) 199 Fed. 365. From the return, however, it appears that the Secretary intended that the commissioner should deport petitioners to Austria. This is the meaning which he and the Commissioner attach to the indefinite words of the warrant. In my opinion the warrant as thus interpreted is illegal. Under section 761 of the Revised Statutes (U. S. Comp. St. 1901, p. 594), the court is not confined to simply remanding or releasing petitioners, but may compel a proper and lawful disposition of them. The Supreme Court in Storti v. Massachusetts, 183 U. S. 138, 143, 22 Sup. Ct. 72, 74 (46 L. Ed. 120), quoting this statute, said:

"The command of the section is 'to dispose of the party as law and justice require.' All the freedom of equity procedure is thus prescribed; and substantial justice, promptly administered, is ever the rule in habeas corpus."

See, also, In re Gut Lun (D. C.) 84 Fed. 323. The court evidently overlooked this statute in United States v. Williams (D. C.) 187 Fed. 470.

It is therefore ordered that judgment be entered in each of these cases directing the Commissioner of Labor, in whose custody the petitioner is, to deport him forthwith to the Province of Manitoba, in the Dominion of Canada, and forbidding such commissioner, or any person acting under his direction or authority, or under the direction or authority of the Secretary of Labor, to deport said petitioner to any other place than above specified, or to restrain him of his liberty longer than shall be reasonably necessary to execute such judgment.