Ex parte CALLOW.

(District Court, D. Colorado.   July 1, 1916.)

No. 6526.

1. ALIENS ⊜⇒49—DEPORTATION—PUBLIC CHARGE.
   In a proceeding for the deportation of an alien, evidence *held* insufficient to show that he was likely to become a public charge, so as to be subject to deportation, under Act Feb. 20, 1907, c. 1134, 34 Stat. 898.
   [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 107.]

2. ALIENS ⊜⇒53—IMMIGRANTS—INSPECTION—EFFECT OF.
   One favorable inspection does not entitle an alien who has entered the United States and departed to re-enter at a future time; and this is so regardless of the alien's belief as to his rights.
   [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112.]

3. ALIENS ⊜⇒53—INSPECTION—DEPORTATION.
   Under Immigration Act Feb. 20, 1907, c. 1134, § 36, 34 Stat. 908 (Comp. St. 1913, § 4285), declaring that all aliens who shall enter the United States, except at the seaports thereof or at such place or places as the secretary of labor may from time to time designate, shall be adjudged to have entered the country unlawfully and shall be deported, an alien who entered from Canada at a designated port of entry, but walked by unobserved the place of inspection, is subject to deportation; the act placing the burden on the alien to present himself at the proper place for inspection, and the result being the same, though the alien had been inspected and passed on a previous entry into United States.
   [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112.]

4. ALIENS ⊜⇒54—DEPORTATION PROCEEDINGS—EVIDENCE.
   Where an alien's deportation was properly ordered, because he had not been inspected as required by Immigration Act, § 36, the fact that he was improperly denied by the inspector of immigration the right to rebut charges that he was guilty of statements and demonstrations of anarchistic tendencies was immaterial; such matters not affecting the propriety of his deportation.
   [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112.]

5. ALIENS ⊜⇒54—DEPORTATION PROCEEDINGS—WARRANTS.
   A warrant of deportation should expressly name the country to which the alien is to be taken, and is too indefinite where it merely directed return to the country whence the alien came, and that fact was susceptible of more than one interpretation.
   [Ed. Note.—For other cases, see Aliens, Cent. Dig. § 112.]

6. HABEAS CORPUS ⊜⇒92(1) — DEPORTATION PROCEEDINGS — AUTHORITY OF COURT.
   On habeas corpus to obtain release from restraint under a warrant for deportation, the District Court will not in the first instance determine the country from whence the alien came, where that question could be determined in more than one way and was left open by the warrant of deportation.

Habeas Corpus.   In the matter of the application of Harold E. Callow, otherwise known as H. E. Callow, for writ of habeas corpus to secure his release from restraint in deportation proceedings.   Order nisi granted on condition that, if the country to which deportation shall

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

be had be designated, the writ will be discharged, and petitioner remanded to custody.

Whitehead & Vogl, of Denver, Colo., for petitioner.

H. B. Tedrow, U. S. Dist. Atty., and Otto Bock, Asst. U. S. Atty., both of Denver, Colo., for respondents.

LEWIS, District Judge. This is a proceeding in habeas corpus. The petitioner is a British subject, and the restraint complained of is by an inspector of immigration who, at the time the writ issued, held the petitioner under a warrant for deportation.

[1] The warrant of arrest was issued February 28th last and named two grounds as violative of the Act of February 20, 1907, and its amendment (Act March 26, 1910, c. 128, 36 Stat. 263), to wit:

"That he (H. E. Callow) was a person likely to become a public charge at the time of his entry into the United States; and that he entered without the inspection contemplated and required by said Act."

The arrest was made March 3d and the hearing under the charges in the warrant came on March 29th. The proofs were then submitted to the Secretary of Labor who issued the deportation warrant on May 15th last, after finding that both of the charges in the warrant of arrest had been sustained by the proof.

After return had been made to the writ of habeas corpus the matter was submitted to the court on a transcript of the testimony taken at the hearing before the inspector,—one page of the testimony of the witness Schwab, a Denver police officer, appears, however, to have been omitted. Arguments of counsel were heard at length, and since then all of the testimony taken before the inspector (except the missing page) has been carefully read over, and the facts disclosed therein deliberately considered. From these facts it conclusively appears that the petitioner is a British subject about thirty-five years of age, that he is a single man, and that he is in good health and sound in body and mind. He was born in London and his parents reside there, but he claims to be a citizen of Canada, and entered the United States from that dominion in October, 1914, having about $75.00 on his person. In company with an American he walked across the international boundary line at Noyes, Minnesota, which has been designated and established as one of the Canadian border ports of entry for aliens, but was not inspected. He had been in Canada just prior to his entry since August, 1913, having landed at Quebec at that time. When in London he worked at wagon building. He had made a number of trips across the Atlantic from London, sometimes landing at a Canadian port and sometimes at a port of the United States. He first came over in 1902, and lived in Montreal about eleven months. He returned to England and came back to Montreal in 1903. He went back to England in the latter part of 1903 and came over to the United States in July, 1904. He returned to London on the S. S. London Bridge as a fireman in 1908, and returned to New York on the S. S. Mauratania in July, 1908. He left New York in December, 1912, on the S. S. Kroonland as a "trimmer" or "coal-passer"; then he sailed from Liverpool and landed at Quebec in August, 1913, and, as said, remained in Canada from that time for

about fourteen months until he came to the United States. While in Canada he had no fixed place of residence. He started from Winnipeg when he came to the United States in October, 1914; but before that had visited different places, sometimes looking for work in the harvest fields and obtaining such employment, and at other times engaged in other work for short periods. He also worked in the harvest fields when in the United States, and at the time of the hearing before the inspector was in the employ of McPhee & McGinnity Company, dealers in lumber and building supplies at Denver, though neither while in the United States nor in Canada did he work at all continuously, but traveled from place to place and sought employment from time to time as his inclination dictated and as his necessities might require. He owns some financial interests in London which bring him in a regular income of about $150.00 a year, and received remittances from this source at different times while in Canada and the United States, and at the time of his arrest had some money in a bank at Denver. The only time that he was unable to support himself was during a few days in the winter of 1914 when he went to the Municipal Lodging House in Chicago, but that appears to have been brought about by an unexpected delay in the transmission of a remittance from London due to European war conditions. He did not bring any baggage with him when he came into the United States, and it seems fairly inferable from all of the testimony that as he went from place to place in Canada and the United States he had nothing except what he carried with him on his person.

No reasonable inference can be drawn from these facts which in anywise support or tend to support the charge and finding, "That he was a person likely to become a public charge at the time of his entry into the United States," as set forth in the warrant of deportation. It must, therefore, be held that the Secretary of Labor was wholly without right or authority, under the Acts of Congress which define and limit his power to make such a finding, to use such a finding as a basis on which to issue a warrant of deportation, and on that warrant legally authorize the restraint of the petitioner of his personal liberty and thus transport him through and from the United States.

[2, 3] 2. The other ground set forth in the warrant raises only a question of law on the admitted facts. On each of the prior occasions that the petitioner entered the United States, whether at seaports of entry or along the international boundary, he came through inspection offices. He had entered on the S. S. Carpathia in July, 1904, on the S. S. Mauratania in July, 1908, from Emerson, Can. (landing port Noyes, Minnesota) in September or October, 1906, at Seattle in December, 1910, at Portal, N. D. (landing port), in October, 1912. He testified that on his last entry (October, 1914) he just walked across the boundary line at Noyes along the road in sight of the inspection office but was not inspected, and that he did not think it was necessary or required that he should be inspected. Both Portal and Noyes had been designated by the Secretary as Canadian border ports of entry. Of course, one favorable inspection does not give the alien a right to enter at all future times. It only applies to the one entry at which the in-

spection is made. The alien may be entitled to enter at that time, but when he seeks to enter again at a later period, conditions may have arisen that would require his exclusion. And it is not material as to what he may have honestly believed about his right to enter the second time without inspection. He is subject to the restrictions found in the Act however good his intentions may be. Section 36 of the Act reads in part in this way:

"That all aliens who shall enter the United States, except at the seaports thereof, or at such place or places as the Secretary of Labor may from time to time designate, shall be adjudged to have entered the country unlawfully and shall be deported as provided by sections 20 and 21 of this Act."

The plain purpose of this section, when considered with other pertinent parts of the Act, is to require all aliens who enter the United States to submit themselves to inspection when they so enter. If they enter at seaports they are inspected at the place of landing, and if not at seaports, they must present themselves for inspection at the places designated by the Secretary for that purpose. The Act justly places the burden on the alien to present himself at the proper place. It does not contemplate nor permit that he shall walk by, and if unobserved, then be entitled to claim that he is in by right; but to the contrary, the section expressly declares that he is thus unlawfully in the country and shall be deported.

I am, therefore, of the opinion that under the admitted facts it was clearly the lawful right and duty of the Secretary to issue his warrant for the deportation of the petitioner on that ground as set forth in the warrant, to wit:

"That he entered without the inspection contemplated and required by said Act."

[4] It is insisted by counsel that petitioner did not have a fair and impartial hearing before the inspector. That is, that the inspector called witnesses and adduced from them evidence of facts wholly irrelevant to either of the charges in the warrant of arrest; and additionally that there had been an express agreement and understanding between the inspector and petitioner's counsel that the matters so testified to would not be gone into. And also that after this evidence had been adduced the inspector arbitrarily refused to grant petitioner additional time in which he might have an opportunity to call witnesses who would refute the testimony so given. This testimony was transmitted as a part of the record to the Secretary, and was doubtless reviewed by him with the other proof before issuing the warrant. It is highly prejudicial but immaterial to both charges set out in the warrant of arrest. It discloses unpatriotic utterances, anarchistic in their tendencies; it represents the petitioner as denouncing both the governments of Great Britain and the United States, and cursing their flags. The petitioner denied making any such utterances, and denied the charges that he was opposed to organized government or in any manner unfriendly to the government of his own country or that of the United States. He and his counsel insisted that if they were given an opportunity they could produce evidence directly to the contrary.

That is, he would be able to show that he made none of the statements attributed to him in any of the street talks, nor at any other time attributed to him by the witnesses called by the inspector. That on the contrary he would establish by witnesses, if given an opportunity to call them, that he said nothing that could in any manner be construed as unpatriotic to his own country or denunciatory and critical of our country. That he belongs to the "Marxine School" which teaches the common brotherhood of man, that nations should not be divided and that all humanity should live under one organized system and under one social pact, and (inferentially) that he was opposed to any flag which should be hoisted as an insignia under which men should war one against another. But however unfair the conduct of the inspector may be believed to be, it can certainly have had no possible effect on the charge that the petitioner entered the United States without inspection and was thus here unlawfully. All of the facts in that respect were testified to by him, and no other evidence on the subject was introduced. I therefore am of opinion that this objection must be held to be without merit and wholly immaterial.

[5] 3. The warrant of deportation directs that the petitioner be returned "to the country whence he came." This is challenged for indefiniteness, and that for that reason the writ is void on its face. It does not designate the country to which the petitioner shall be taken on deportation. The officer executing the writ could not know from the writ what he was required to do in its execution. He could not execute it without looking outside of the authority under which he is authorized to act. It is not enough that the warrant recites that the petitioner "landed at the port of Quebec, P. W. ex. S. S. Megantic on the 10th day of August, 1913," and that he is to be returned to the country whence he came at the expense of the steamship company importing him. He is not without right simply because he is subject to deportation. He cannot simply be sent away. He has a right under the Act to be returned to the country from which he came, and to be protected in that right, the warrant which authorizes the deportation should expressly name the country to which he is to be taken; and that right should not be left to the determination of the officer executing the warrant or to the transportation company which brought him in as their judgment or convenience might dictate.

[6] 4. It was said in argument by petitioner's counsel that the purpose was to transport the petitioner to England, and this was freely conceded to be true by counsel for the inspector; and the petitioner thereupon earnestly contended that the only country to which he could be deported was the Dominion of Canada; that he had continuously resided there for more than one year before entering the United States, had acquired a domicile there and must be returned to Canada if deported. I was disposed at the argument to accept that view, but since a careful reading of the record I am in doubt whether under the facts disclosed his residence in Canada was such as to establish in him a right to be sent there rather than to England. In that respect I find no similarity between the facts here and those dealt with by Judge Amidon in Ex parte Gytl et al. (D. C.) 210 Fed. 918. In

that case the petitioners had gone to Canada with the purpose and intention of making it their future home. So far as the record disclosed they had no thought of returning to the country from which they came to Canada or of going elsewhere. I can reach no such conclusion in this case. Viewing the record of the petitioner during the last fourteen years it cannot be said that while he was in Canada for the fourteen months just prior to coming to the United States he at any time during the period had in mind the purpose of remaining there and of becoming a permanent resident. While in Canada on his various visits and also while in the United States he went from place to place, then back to England again, and then returned to North America. There is nothing to indicate that his conduct in the future will be otherwise than it has been in the past. At least the record is such as to render it highly uncertain whether he at any time had any desire, purpose or intention of remaining in Canada. I think opposite conclusions can be drawn from the record in this respect,—on the one hand, that he intended to remain in Canada, or the other, that his stay there was only temporary and that he would return to England. I am not disposed, therefore, to assume to try to control the judgment of the Secretary in this respect, whether it be that he should be returned to Canada or to England.

The order will be nisi. The petitioner may stand at large on his present bond, and if within twenty days from this date the Secretary shall issue a warrant of deportation on the ground above stated, designating the country, either Canada or England, to which the petitioner shall be deported, the writ will be discharged and the petitioner remanded to the custody of Henry H. Moler, local immigrant inspector at Denver. Otherwise, he will be set at liberty.